IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | | |
|---|---|---|
| JOHN AMEEN ABDULLAH, PRO SE, | § | |
| also known as CLEVELAND MORRIS, | § | |
| TDCJ-CID No. 1184896, | § | |
| ADC No. 119402, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:10-CV-0272 |
| | § | |
| EDDIE L. WHEELER, | § | |
| MITCHELL BRADSHAW, | § | |
| MATTHEW WILSON, | § | |
| CHARLES D. CLAYBROOK, | § | |
| DENNIS MARKGRAF, GLEN HATAWAY, | § | |
| ELAINE TURNER, JONATHAN JOSLYN, | § | |
| DAISHA SIMMONS, GEORGENA CLOWER, | § | |
| PEGGY BYRD, PATRICIA FLOWERS, | § | |
| ROGER HEY, WILBURN HINSLEY, | § | |
| GARY MESSER, KIMBERLY FISK, | § | |
| LORENE LAFAVE, CHRISTY GAHAGAN, | § | |
| KENYON PAGE, ELBERT HAMPTON, | § | |
| MELANIE WILLINGHAM, | § | |
| BENJAMIN LEEAH, JANIE ROWLEY, | § | |
| GINGER MARQUEZ, | § | |
| ANTHONY MARQUEZ, | § | |
| LARRY GOUCHER, BARRY L. MARTIN, | § | |
| STACY WHITTENBURG, | § | |
| TERRELL DAVIS, and UY JULITO, | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION

Plaintiff JOHN AMEEN ABDULLAH, also known as CLEVELAND MORRIS, acting

pro se and while a prisoner confined in the Texas Department of Criminal Justice, Correctional

Institutions Division, has filed suit pursuant to Title 42, United States Code, section 1983

complaining against the above-referenced defendants and has been granted permission to proceed in forma pauperis.

Plaintiff alleges that, on December 18, 2008, he was injured due to falling debris and glass from a skylight that had broken five days earlier.  Plaintiff's allegations continue concerning incidents and medical treatment he did or did not receive over the next year and a half.  Plaintiff claims "Negligence/Deliberate Indifference of Adequate Medical Care or Treatment . . . in violation of the Eighth Amendment and . . . retaliation [by] written falsified disciplinary cases and puinish[ment] in violation of the Due Process Clause . . . of the Fourteenth Amend. of the U.S. Constitution."  Plaintiff says he is suing each defendant in their individual capacity.

Plaintiff requests injunctive relief and an award of compensatory and punitive damages.

## JUDICIAL REVIEW

When a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, the Court must evaluate the complaint and dismiss it without service of process, *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir. 1990), if it is frivolous[1], malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. 1915A; 28 U.S.C. 1915(e)(2).  The same standards will support dismissal of a suit brought under any federal law by a prisoner confined in any jail, prison, or other correctional facility, where such suit concerns prison conditions.  42 U.S.C.

---

[1]A claim is frivolous if it lacks an arguable basis in law or in fact, *Booker v. Koonce*, 2 F.3d 114, 115 (5th Cir. 1993); *see*, *Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992).

1997e(c)(1).  A *Spears* hearing need not be conducted for every *pro se* complaint.  *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991)[2].

The Magistrate Judge has reviewed the facts alleged by plaintiff to determine if his claims present grounds for dismissal or should proceed to answer by defendants.

## THE LAW AND ANALYSIS

The factual recitations contained herein, including those concerning plaintiff's medical care, were provided by plaintiff in his Complaint, the typewritten attachment thereto, and various medical records plaintiff attached to pleadings at Docket Entries 13 and 16.

### DELIBERATE INDIFFERENCE TO DANGER PRESENTED BY THE BROKEN SKYLIGHT

Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994).  Plaintiff presents no allegation to support a claim of deliberate indifference in connection with the broken skylight.  Instead, he alleges that the broken skylight was reported to several officers who then reported it on Maintenance AD-84 forms.  Plaintiff states he is suing Senior Warden Eddie L. WHEELER in his individual capacity because he's "in charge of all other defendants and of plaintiff's safekeeping;" Asst. Warden Mitchell BRADSHAW in his individual capacity because he's "responsible for all inmate's safekeeping;" Charles D. CLAYBROOK, Program Specialist II Head/Supervisor of Maintenance at Dalhart for failing to immediately arrange to have the skylight boarded up or repaired; and Glen HATAWAY, the Unit Risk Management Officer,

---

[2]*Cf, Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986) ("Of course, our discussion of *Spears* should not be interpreted to mean that all or even most prisoner claims require or deserve a *Spears* hearing.  A district court should be able to dismiss as frivolous a significant number of prisoner suits on the complaint alone or the complaint together with the *Watson* questionnaire.").

because he's responsible for "managing and maintaining all safety hazards at the Dalhart Unit."

The facts as presented by plaintiff, however, do not show the defendants, or any of them, knew

of the broken skylight, drew an inference that it still presented a substantial danger of serious

injury or ignored such inference. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1981, 128

L.Ed.2d 811 (1994). Although plaintiff argues they or someone should have taken steps to board

up the skylight, this allegation only supports a claim of negligence, if even that. Section 1983

imposes liability for deprivation of constitutionally protected rights, not for violations of tort

duties of care. *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990). Conduct which is

merely negligent does not meet the standard for liability under section 1983. *Daniels v.*

*Williams*, 474 U.S. 327, 331-34, 106 S.Ct. 662, 664-67, 88 L.Ed.2d 662 (1986)(inmate slipped

on pillow left on stairs).

Plaintiff also appears to sue defendants WHEELER, BRADSHAW, CLAYBROOK, and

HATAWAY in whole or in part because of their supervisory capacities; however, the acts of

subordinates trigger no individual section 1983 liability for supervisory officers. *Champagne v.*

*Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999). Plaintiff has not alleged

facts showing one or more of the defendants was personally involved in the acts causing the

deprivation of plaintiff's constitutional rights or that there is a sufficient causal connection

between the official's act and the constitutional violation sought to be redressed. *Thompkins v.*

*Belt*, 828 F.2d 298, 304 (5th  Cir.1987); *Douthit v. Jones*, 641 F.2d 345,  346 (5th Cir.1981) (*per*

*curiam*).

Plaintiff's allegations against defendants WHEELER, BRADSHAW, CLAYBROOK, and

HATAWAY fail to state a claim on which relief can be granted.

**ALLEGATIONS CONCERNING DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

When the glass and debris fell from the skylight, plaintiff says some hit him in the head and on his left leg.  Plaintiff claims various defendants displayed deliberate indifference to his serious medical needs after the accident and that "Medical, Security, and Administration conspired to violate plaintiff [sic] no-lifting restrictions on 4/15/09 that led to plaintiff's Degenerative Joint Disease in Cervical, Lumbar, and Thoracic Spine that's constantly worsening[3]."

Immediately after being hit with falling debris, plaintiff says he remained seated at the table and lay his head on the table.  He says his left leg was bleeding and his head and neck hurt. Plaintiff says he was escorted to the medical department by Sgt. HINSLEY, where he was seen by defendant BYRD, Sr. LVN.  Despite Sgt. HINSLEY's statement that plaintiff had only suffered minor wounds, defendant BYRD interviewed plaintiff, cleaned the cut on his leg and changed his clothes.  Sr. Corr. LVN WILSON gave plaintiff an ice pack, saying he could not have another one.  Plaintiff was sent back to his housing area, but he asked to return to medical because of his pain.  Plaintiff was required to fill out an accident statement and have pictures taken of his injuries at the line building first.  Then he was allowed to return to medical where LVN LYSFORD gave plaintiff 800 mg. of Ibuprofen and sent him back to his cell.  The next day plaintiff was seen by Ms. FISK, M PA-C, who ordered a CT Scan of his head and neck.  The CT Scan was performed on December 19, 2008 and showed some straightening of plaintiff's cervical spine, suggesting plaintiff had a muscle spasm.

---

[3]Plaintiff's Statement of Claim at page 4 of the Complaint form.

Plaintiff says he saw defendant FISK, M PA-C, again on December 20, 2008, the day after his CT Scan, and was prescribed a cervical collar.  He says defendant FISK, M PA-C, informed him the muscle spasm in his cervical spine would hurt him for a long time.  When defendant FISK offered plaintiff medication, such as muscle relaxants, plaintiff refused.  Plaintiff asked about therapy, but defendant FISK said "she don't do therapy."  When plaintiff requested heat packs, defendant FISK ordered him to have heat packs twice a day.  Plaintiff then says, ambiguously, that he didn't receive that treatment or didn't receive it that day.  Nevertheless, plaintiff doesn't identify who was responsible for that failure to provide the prescribed heat packs whether for one day or longer nor does he allege facts showing that failure was the result of deliberate indifference.

Plaintiff submitted a grievance on December 23, 2008 requesting medical treatment "until there was no more pain, etc."  When plaintiff had a problem at work, defendant FISK gave him a Medically Unassigned status so he didn't have to work.  On January 2, 2009, defendant FISK asked plaintiff if he wanted physical therapy at the Montford[4] Unit and, on January 8, 2009, plaintiff said yes.  Defendant FISK told him she would expedite the request.  Plaintiff was approved and was told he would be going within thirty days.

On January 27, 2009, plaintiff left on a medical transport to the Montford Unit, but it was cancelled en route because of the weather.  Plaintiff was returned to the Dalhart Unit the next day by officers from the Clements Unit.  Plaintiff complains that when he got to the Dalhart Unit, he was refused a moving buggy and was required to drag his property by a Sgt. HAMPTON and other supervisors.

---

[4]Plaintiff misspells "Montford" as "Mumford".

6

On February 2, 2009, plaintiff saw defendant FISK, M PA-C.  Although plaintiff says defendant FISK gave him a no-lifting restriction for 99 days, the Clinic Notes submitted by plaintiff for that visit [Exhibit F to plaintiff's motion at Docket Entry 13] show he was restricted from lifting over 35 lbs. for 99 days.  He was also rescheduled for physical therapy at the Montford Unit and an X-Ray of plaintiff's lumbar spine was ordered.

The X-Ray of plaintiff's lumbar spine was performed on February 6, 2009 and "showed an unremarkable spine series[5]."

On March 12, 2009, plaintiff says he was seen at the Montford Unit by therapist Chris Trevino, who explained it was important to relax plaintiff's neck spasm because it could cause him long term chronic problems and that he was not to play any contact sports or lift anything heavy.  Plaintiff says he was shown cervical exercises and given instructions on performing stretches and told to be very careful.

It is clear that, after the skylight accident, plaintiff received prompt and responsive medical care.  Nothing in the facts presented to this point indicates any medical care giver or other prison personnel knew of facts indicating plaintiff was in substantial danger of serious harm, drew the necessary inference of potential harm, and ignored such inference.  *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994).

Plaintiff claims "Administration, Security, and Medical conspired to violate his no lifting restrictions . . ."  He supports this claim by alleging that, on or about April 15, 2009, he was moved to a new cell "clear across the unit."  Plaintiff says that when he tried to refuse to move

---

[5]Plaintiff's typewritten attachment to his original complaint at paragraph 48 and plaintiff's Exhibit V attached to his motion at Docket Entry 16.

his own property, defendant Sgt. HAMPTON and defendant Asst. Warden BRADSHAW

responded with vulgar remarks and defendant BRADSHAW "gave ranking officers the [sic]

consent to do what . . . they want[ed] to plaintiff."  Plaintiff  says he "humbly explained to

defendants what the therapists told him about his condition, but defendant BRADSHAW said all

he cared about was what was on plaintiff's medical records."

Prison officials do not have a constitutional duty to believe an inmate's claims as to his

medical condition as opposed to the findings of medical professionals.  *See, e.g., Althouse v.*

*Roe*, 542 F.Supp.2d 543 (E.D.Tex. 2008) (citing *Taylor v. McElvaney*, slip op.no. 1:01cv94

(N.D.Tex., Aug. 12, 2002)(unpublished) (available at 2002 WL 32138256)(no duty to believe

inmate's allegations over officer's statement and medical record) (citations omitted)).

BRADSHAW and HAMPTON were not required to accept plaintiff's statements concerning

what his physical therapist had said instead of referring to the assessment of plaintiff's

capabilities by defendant FISK, M PA-C, or Dr. LEEAH and other medical personnel.

Plaintiff says defendant BRADSHAW called defendant FISK inquiring about plaintiff's

restrictions and says "Fisk apparently went along with their plan to force plaintiff to lift property

to see if plaintiff was pretending . . . or really seriously hurt."  This statement, of course, is

merely speculative and contradicts plaintiff's later statement that defendant FISK said she had

given him a lifting restriction but gave the wrong date for its beginning.

Plaintiff says he finally agreed to lift his property and was given time to break it down

into bundles.  He says he then slid two bundles in front of him to the entrance of J wing.

Defendant DAVIS then became impatient and told plaintiff to pick up the third bundle.  Plaintiff

says when he lifted the third property bundle, he "felt a popping in his cervical of spine and in his back of spine as he fell backwards with his property," yelling in pain.

Plaintiff says he was taken to medical on a gurney where he was seen by defendant FISK, who administered an IV.  He says she "admitted" she had given him a no-lifting restriction but gave the wrong date, saying it was in December, not in February.  Plaintiff says "defendant" "falsified plaintiff's condition before, during and after the fall to cover their [sic] fault of causing plaintiff more injury.  Plaintiff provides no factual allegations in support of this claim of falsification and, therefore, fails to state a claim on which relief can be granted.

Further, plaintiff alleges at a subsequent point in his complaint, on June 6, 2009, he was informed by a Nurse Rodriguez that his no-lifting restriction had been taken off when a Stacey WHITTENBURG "failed to do her job."

Plaintiff says he was released hours later but is no longer the same and cannot walk normally.

Plaintiff's allegations indicate, at most, that his lifting restrictions were not listed in his records because of accident or negligence.  If prison personnel did not find a record of those restrictions when defendant BRADSHAW inquired, no one can be said to have had knowledge of facts indicating plaintiff was in danger, serious or otherwise, of substantial harm from lifting his property.  Under the circumstances alleged by plaintiff, he cannot support a claim of deliberate indifference.  Further, plaintiff has presented no material facts to support his claim of conspiracy among "Administration, Security, and Medical."  Conclusory allegations lacking reference to material facts are not sufficient to state a claim of conspiracy under section 1983.

*McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir.1989), *cert. denied*, 493 U.S. 1083, 110

S.Ct. 1141, 107 L.Ed.2d 1046 (1990).  Plaintiff's allegation of conspiracy fails to state a claim on which relief can be granted.

On April 16, 2009, plaintiff received a major disciplinary case from Officer LOWERY for lying about having a no-lifting restriction.  Major WILSON, however, terminated the case on April 17, 2009, before it ever went to a hearing.

On April 17, 2009, plaintiff saw a nurse to complain about his muscle relaxant, which, he says, didn't "sit right" with him.

Plaintiff had a second lumbar spine X-Ray on April 18, 2009, which showed mild degenerative joint disease[6].  Plaintiff says the X-Ray tech told plaintiff he may need a back brace and that his nerves could be affected.  Plaintiff also had an MRI[7] on April 24, 2009 which showed "mild disc dessication to all discs, without significant disc bulging, protrusion or herniation.  Minimal annular bulging is seen at C3-4, with slight reversal of cervical lordosis at C3-4.  Slight reduction to the anterior epidural space is seen."

While plaintiff says this explains why his hands were shaking and why he couldn't lift his right arm up past his shoulder for months during the heat packs on his neck and back, there is no documentation of such or reference to such in the MRI report[8] or in any other medical records he has submitted.

Plaintiff further complains he was placed in vocational training, which required his "Medical Unassigned" restriction to be lifted.  He says he constantly made defendant FISK

---

[6]Plaintiff's Exhibit V to Docket Entry 16.

[7]Plaintiff's Exhibit X to Docket Entry 16.

[8]Id.

aware of his ongoing pain and was taken out of school and couldn't do his testing because he was attending physical therapy at Montford at the same time.  Plaintiff says he submitted a sick call request because of the removal of restrictions and saw defendant FISK on May 27, 2009.  He says FISK found his HSM-18 chart showed plaintiff's lifting restrictions had been removed and defendant KENYON PAGE said he would investigate to discover who had changed the restrictions without defendant FISK's authorization.  Plaintiff says that, on May 30, 2009, defendant PAGE told him defendant FISK had updated plaintiff's restrictions but that, when they ran out, plaintiff could go back to work.  Plaintiff says PAGE and FISK lied to him in that, although he was excused from school because of his pain, he was later required to work, despite his pain.

On June 6, 2009, plaintiff saw a Nurse Rodriguez who told him his no-lifting restriction had been taken off when a Stacey WHITTENBURG failed to do her job.  Plaintiff says she told him he needed to get out of the system to get proper help.

On June 11, 2009, plaintiff was seen by the physical therapist at Montford, who said he would fax defendant FISK a letter recommending continuation of plaintiff's restrictions and more exercises for the back and cervical spine.

On July 3, 2009, plaintiff saw Nurse ROWLEY who made an appointment for him to see defendant FISK.  He saw defendant FISK on July 7, 2009 about taking steroid medication for his back, neck and leg problems.  At that time, defendant FISK refused to give plaintiff back his restrictions.

A few days later, plaintiff was taken to medical on a gurney when his sciatic nerve began acting up.  He was treated by Nurse WILSON who gave him a cell pass for three days.  Plaintiff

saw defendant FISK on July 21, 2009 who said she was unfamiliar with his sciatic nerve problem and referred him to Dr. LEEAH.

On or about July 28, 2009, plaintiff says he fell in his cell.  He says he was unable to get up but the guards did not believe him and he was threatened with a disciplinary case for not getting up.  Plaintiff says defendant MARKGRAF ordered the officers to leave plaintiff on the floor until he came back, but the shift changed and officers did not return, so plaintiff tried to pull himself up but his legs slid outside the cell door.  Three hours after his fall, another officer found plaintiff on the floor partly out of his cell.  Defendant Lt. SIMMONS refused to lift plaintiff up but called the medical officer.  Plaintiff's cellmate pulled plaintiff inside his cell. Lieutenant SIMMONS gave plaintiff a pass to go to medical at 7:00 a.m. to see Director of Nurses Ms. GAHAGAN, who said that since plaintiff was back inside his cell he should be left on the floor.  Other than lying prone on the floor, plaintiff does not point to any specific harm he suffered as a result of GAHAGAN's decision.

In the morning, plaintiff walked to the floor officer and asked to go to medical.  Medical was called and said plaintiff could get there the best way he knew how.  Plaintiff says he attempted to walk to medical but fell when a strong pain shot up his left leg.  A wheelchair was sent for and plaintiff was rolled to medical where he saw Dr. LEEAH as soon as Dr. LEEAH arrived.

Doctor LEEAH examined plaintiff for evaluation of left leg pain and intermittent paralysis[9].  Doctor LEEAH diagnosed neck pain from previous injury and SI joint pain with left sciatica.  He reviewed plaintiff's X-Rays of his lumbar spine taken 2/6/09 and 4/18/09 and said

_____

[9]Plaintiff's Exhibit G to Docket Entry 13.

plaintiff had mild Degenerative Joint Disease which was responsive to NSAIDs.  He also reviewed plaintiff's neck MRI taken 4/24/09 and said it showed mild Degenerative Joint Disease.  Doctor LEEAH notes he "had extensive conversation with [plaintiff] regarding his expectations and if he truly wants to get well."  He concluded plaintiff was "appropriately invested in his care and motivated to improve."  Doctor LEEAH restricted plaintiff to lifting no more than 35 lbs. for 90 days and medically unassigned him.  Doctor LEEAH prescribed hot pack treatments for plaintiff's neck and left SI joint for 30 days after exercises.  He also ordered a repeat lumbar spine X-ray and a follow-up appointment with plaintiff in 30 days.

Plaintiff says he received a heat pack treatment but was denied a cane or crutch and was told he had to force himself to walk through the pain and not give in to it.  Plaintiff walked back to his cell.

Later that day, plaintiff fell again and was taken to the infirmary on a gurney where Nurse GAHAGAN gave him some additional stretches and exercises, as well as ice packs rotating with heat packs.

On August 5, 2009, plaintiff's X-Ray of the lumbar spine was taken and showed only "Mild degenerative changes and levoscoliosis."[10]   On August 18, 2009, plaintiff was seen by Dr. LEEAH who noted plaintiff's degenerative disc disease was worsening.  He gave plaintiff a crutch for sixty days and ordered another MRI of plaintiff's lumbosacral spine[11] with a follow-up appointment afterwards.

---

[10]Plaintiff's Exhibit W to Docket Entry 16.

[11]Plaintiff's Exhibit H to Docket Entry 13.

On October 1, 2009, plaintiff saw Nurse GAHAGAN who emphasized plaintiff would continue to hurt and needed to stretch before he does any exercises.

On October 20, 2009, plaintiff was seen by Dr. LEEAH who noted plaintiff's complaints of severe pain in the left leg and difficulty walking.  Doctor LEEAH diagnosed DJD lumbosacral spine with levoscoliosis and neck pain.  He continued plaintiff on Ibuprofen and updated his restrictions and blue cards[12] to continue until November 20, 2009.  Doctor LEEAH also renewed plaintiff's crutch pass for another thirty days, gave him a low row restriction, and lowered his lifting restriction to 5 pounds[13].

On September 17, 2009, plaintiff saw his physical therapist again and was given a stress test for his heart the next day.

On November 10, 2009, plaintiff says his blue cards were taken by Officer MELANIE WILLINGHAM.

On November 17, 2009, plaintiff was seen by Dr. LEEAH again and his crutch was renewed for ninety more days[14].  Doctor LEEAH observed plaintiff had not received the MRI he had previously ordered and noted he would contact Utilization Management to arrange for an MRI of plaintiff's thoracic and lumbar spine.  He also changed plaintiff's restrictions, medically unassigning plaintiff for ninety more days, giving him a no lifting over 5 pounds for ninety days, continue the crutch pass for ninety days, and continuing heat treatment, to alternate with ice, for thirty days.  Plaintiff was to continue on his current medications.  Doctor LEEAH also noted

---

[12]The Court understands blue cards are an authorization given to inmates to carry on their persons to show they are validly in possession of medical equipment, such as crutches.

[13]Plaintiff's Exhibit I to Docket Entry 13.

[14]Plaintiff's Exhibit J to Docket Entry 13.

14

plaintiff's recent stress test, that he was negative for arrhythmias, and that his neck pain was improving.

On November 29, 2009, plaintiff fell in his cell when his left leg failed and he hit the side of his head and face on the concrete floor. Plaintiff was taken to Coon Memorial Hospital where a CT-Scan was performed on his head and neck. The results were normal[15].

On December 22, 2009, plaintiff saw Dr. LEEAH, who informed him the CT-Scan showed nothing was wrong with plaintiff's head or neck. Doctor LEEAH ordered another MRI and informed plaintiff he had progressive symptoms relating to Degenerative Joint Disease/Degenerative Disc Disease in the lumbar spine as well as mild levoscoliosis in the thoracic spine.

Plaintiff received another lumbar spine X-Ray on January 15, 2010[16]. The MRI showed evidence of mild canal narrowing from L2-3 through L4-5. Degenerative endplate changes were seen through the lumbar vertebral discs, with the exception of L3-4. No vertebral body compression fracture was seen. Bone marrow fatty changes were seen at L2, compatible with a vertebral hemangioma. No herniated nucleus pulposus was demonstrated.

Plaintiff says he fell on snow and ice on February 8, and again on February 9, 2010 and was given another crutch.

On February 25, 2010, plaintiff saw defendant FISK who informed him his MRI on his lumbar spine looked good. Defendant FISK referred plaintiff to see a pain specialist and a

---

[15]Plaintiff's Exhibit K to Docket Entry 13.

[16]Plaintiff's Exhibit Y-1through Y-2 to Docket Entry 16.

neurologist specializing in back treatment.  She refused plaintiff's request to be transferred to a medical unit.  Plaintiff was not allowed to see Dr. LEEAH on that day.

On March 12, 2010, plaintiff was not allowed to go to the infirmary by defendant JOSLYN.  Then, plaintiff fell, so a nurse was sent with a wheelchair to treat plaintiff and defendant JOSLYN had two inmates pick plaintiff up and put him into the wheelchair, even though plaintiff was stiff.

On April 5, 2010, plaintiff says he woke up with numbness and tingling in his arms and legs and his hands were shaking but defendant BOYLE wouldn't give him a pass to medical. Plaintiff says he then fell to the floor and was taken on a stretcher to medical.

On April 12, 2010, plaintiff states he was assaulted by his cellmate with an electrical fan. Plaintiff says he disarmed his cellmate and held him, restraining him so he couldn't continue attacking plaintiff.  Plaintiff says his cellmate helped security write plaintiff a false statement that led to plaintiff's medical equipment being confiscated.

On April 12, 2010, plaintiff says he fell again and was sent to the Clements Unit on a medical chain.  Plaintiff was seen by Dr. UY at the Clements Unit who questioned why he had crutches.  Nevertheless, plaintiff was given his crutches back.

On April 23, 2010, plaintiff woke with leg pains and walked to the floor officer to ask for a pass to medical.  He was told he would receive one when medical came to get him, but plaintiff fell while walking back to his cell, hitting his face and right hip on the concrete.  He said he also hurt his groin area.  An officer immediately called medical which sent a nurse and two officers to lift plaintiff into a wheelchair but, when they tried to lift him, plaintiff alleges they hurt his groin more and put him back down.  They left to get a gurney but did not come back for ten hours.

Finally plaintiff was picked up by Director of Nurses TENORIO, Sr. LVN ROWLEY, Lt. JOSLYN, Sgt. POWERS and Sgt. GOUCHER.  Plaintiff was examined by Nurse TENORIO, placed on a gurney, and taken to a segregation cell where he was placed on the floor.  Plaintiff says he stayed on the floor for three days.  On April 26, 2010, plaintiff was given his crutches and instructed to walk to a bus.  Plaintiff says he walked to the bus but crawled onto it.  He was transported to the Clements Unit where he was met with a wheelchair and placed in 11 Building. A little later he was assigned to 4 Building but said he had to have his crutches to walk there. When he showed officers his Blue Pass for crutches, they took it to get him some crutches, but came back without it or the crutches, telling him Dr. LEEAH had taken the Blue Card because it had been issued by a nurse and nurses don't have that authority.  Plaintiff had to walk to his cell without crutches.  On April 27, 2010, plaintiff received a wheeled walker ordered by his physical therapist in January of that year.

Plaintiff has not informed the Court when he received a back brace, but he says it was confiscated on April 28, 2010 because it had a hole in it.

`       On April 29, 2010 plaintiff was called to a meeting with Dr. LEEAH, PA-C/PRN FISK, Director of Nurses TENORIO, Facility Health Administrator PAGE and Major WILSON.  At that meeting, Dr. LEEAH told plaintiff medical would not continue treatment and all scheduled off-unit appointments for treatment were cancelled, including heat and ice packs by therapists. Dr. LEEAH said he was removing plaintiff's restrictions.  He told plaintiff he had no problems in his neck or back and that he was "running a scam."  Plaintiff was forced to relinquish his wheeled walker and was told the skylight, his X-Rays and his MRIs did not matter.

Plaintiff's Clinic Notes for April 29, 2010[17], show plaintiff was brought in to meet with the entire interdisciplinary team consisting of Dr. LEEAH, PA FISK, Major WILSON, Ms. TENORIO, DON, and Mr. Page, FHA.

Plaintiff denied his cellmate's claim that he had been exercising in his cell and manipulating his cellmate into perpetuating the claim that he suffered from back and neck pain. Despite plaintiff's denial, Dr. LEEAH informed plaintiff of his decision to stop any and all medical treatments, referrals, studies and cancel any pending medical appointments, follow-up visits, and treatments.  Plaintiff's restrictions were removed.  Plaintiff was allowed to continue on his current medications.  Doctor LEEAH diagnosed "somatic complaints with no medical diagnoses; suspected malingering based on consistent laboratory and imaging studies that have failed to confirm any disease state and in fact refute medical illness."

Plaintiff complains when he left, he had to walk bent over in excruciating pain and has been doing so to this day.

Plaintiff complains his subsequent Life Endangerment OPI statement was refused by a Lt. CLOWER who told him he needed to submit a grievance, not a life endangerment report.

Plaintiff says on May 5, 2010, his back gave out while he was walking back to his cell and he dropped to his knees.  When defendant FISK and LFN SLATTON arrived, FISK asked SLATTON to check the pulse in plaintiff's feet and legs.  Plaintiff says he was crying in pain, so defendant FISK decided he should be left there rather than moved.  Plaintiff says he later crawled back to his building and cell.

---

[17]Plaintiff's Exhibit N to Docket Entry 13 and his Exhibit T1 through T2 to his Docket Entry 16.

Plaintiff says on May 14, 2010, he was told by defendant TENORIO that he would have chronic pain for the rest of his life but he was going to have to learn to ignore it.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction  of pain' . . . proscribed by the Eighth Amendment."  Such indifference may  be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

However, not every claim of inadequate or improper medical treatment is a violation of the Constitution, *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); nor does a disagreement with a doctor over the method and result of medical treatment require a finding of deliberate indifference.  *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). "[N]egligent medical care does not constitute a valid section 1983 claim."  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  Further, merely alleging that a prison doctor should have undertaken additional diagnostic measures or utilized an alternative method of treatment does not elevate a claim to constitutional dimension.  *Varnado v. Collins*, 920 F.2d 320, 321 (5th Cir. 1991).

Plaintiff's account of his care immediately following his initial injury from falling debris from the skylight shows he received timely, frequent, and responsive care.  He was immediately escorted to medical and given an ice pack.  He went back to medical and was given pain medication.  The next day, he saw defendant FISK, who ordered a CT Scan and, upon receipt of the results, ordered a cervical collar.  Plaintiff was also able to influence the treatment he was

provided; when he turned down medication but requested heat packs, defendant FISK prescribed heat packs twice a day and later placed plaintiff on a medically unassigned status.  In January of 2009, FISK offered plaintiff physical therapy at the Montford Unit and, when plaintiff agreed, she prescribed it.  While the first trip to Montford was cancelled en route, plaintiff does not indicate any defendant was responsible for the cancellation or that there was interference with any later physical therapy treatments.  Plaintiff also received several X-Rays, which initially were unremarkable but later showed Degenerative Disc Disease.

Plaintiff makes plain that, beginning with defendant FISK on December 20, 2008, the medical caregivers, especially FISK, TREVINO, and Dr. LEEAH, told him repeatedly that he was suffering from a chronic condition which would cause him long term pain.  Although he submitted a December 23, 2008 grievance requesting medical treatment "until there was no more pain, etc.," there is no indication complete elimination of pain was possible or that anyone ever told him it was.  Instead, it was made clear to plaintiff that he was going to have to contend with some pain to continue having the mobility he needed.

In February, 2009 plaintiff was given a no-lifting over 35 lbs restriction by defendant FISK but, in April, he says he injured himself further when he was required to lift one of his three property bundles.  Plaintiff has not stated whether the no-lifting restrictions were confined to work duties or whether they applied to every aspect of an inmate's activity, nor has he shown the bundle weight exceeded the restriction.

Critically, plaintiff's own facts show he was allowed to lift up to 35 lbs and had been allowed to separate his property into bundles so that it would be manageable.  Moreover, plaintiff's own allegations are that his no-lifting restriction was not in any of his records when he

was taken to the medical department after his injury.  Thus, the guard who required plaintiff to lift one of his three property bundles and any other prison officials involved would not have knowledge of any lifting restriction.  They, therefore, did not have knowledge of facts indicating plaintiff would be subjected to a serious danger of substantial harm if he were required to lift something.  Plaintiff has not stated a claim of deliberate indifference with respect to his second injury.

In addition, although plaintiff accuses FISK of giving the wrong date for the beginning of the restrictions, he alleges that, about two months later, Nurse Rodriguez explained his no-lifting restrictions were "taken off" when a Stacy WHITTENBURG "failed to do her job."  Plaintiff's allegations are sufficient only to support of claim of negligence, if even that, and do not support a claim for relief under section 1983.  *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990) (section 1983 imposes liability for deprivation of constitutionally protected rights, not for violations of tort duties of care).

Due to his February 2009 status of "Medical Unassigned," plaintiff was allowed to drop vocational training, but complains that, around May 27, 2009, the "Medical Unassigned" status was removed.  This was about the same time plaintiff's lifting restrictions, which had been authorized on February 2, 2009 for 99 days by defendant FISK, expired.

It appears plaintiff feels his physical therapist's June 11, 2009 recommendation that his restrictions be continued should have been controlling.  He alleges no fact, however, indicating the physical therapist's opinion was recorded in his medical records at that point in time. Moreover, even if the therapist's opinion was recorded in plaintiff's medical records, the fact that there was a disagreement among medical caregivers does not show that defendant FISK was

deliberately indifferent to plaintiff's serious medical needs when she allowed the work restrictions to be withdrawn in July or that prison personnel were deliberately indifferent to plaintiff's medical needs in requiring plaintiff to work and to walk to and from his destinations in the absence of medically imposed restrictions.

Plaintiff alleges he fell in his cell on July 29, 2009; however, he says the guards didn't believe him when he said he couldn't get up.  Nevertheless, those guards called Director of Nurses GAHAGAN, who instructed security personnel that plaintiff could be left on the floor of his cell.  She also instructed them to give plaintiff a pass to go to medical at 7:00 a.m.  While the leaving of plaintiff on the floor may be questionable[18], plaintiff does not point to anything indicating he was in need of emergency care nor does he contend that he could not wait until morning to see a medical caregiver or that his condition was worsened by the delay in receiving medical care.  Instead, plaintiff makes clear he was able to walk the next morning and to ask an officer for permission to go to the infirmary.

While walking to the infirmary, plaintiff alleges he fell; a wheelchair was sent, and plaintiff was taken to the infirmary where he saw Dr. LEEAH as soon as Dr. LEEAH arrived that day.  Doctor LEEAH, after reviewing plaintiff's latest X-Rays of 2/6/09 and 4/18/09, as well as his 4/24/09 MRI, diagnosed Degenerative Joint Disease responsive to NSAIDs.  Doctor LEEAH ordered another X-Ray of plaintiff's back, prescribed heat packs and the exercises the therapist had shown plaintiff and re-classified plaintiff as Medically Unassigned with a no-lifting restriction for ninety days.  Doctor LEEAH told plaintiff he had to "walk through the pain and not give into it."  While plaintiff appears to disagree with Dr. LEEAH's refusal to provide

---

[18]Lying flat on a hard surface such as the floor in order to alleviate back pain is not unreasonable.

plaintiff with a cane and his insistence that plaintiff "walk through the pain," plaintiff has offered nothing other than his personal disagreement to show such actions by Dr. LEEAH in any way constituted deliberate indifference to a serious medical need.

Plaintiff's allegations as  presented show plaintiff subsequently received responsive treatment from defendants Dr. LEEAH, Nurse GAHAGAN, and P.A. FISK, although they were not able to arrest the progression of plaintiff's degenerative disc disease or his development of a mild levoscoliosis.  Plaintiff fell several more times and received medical examination and/or treatment.  His November 29, 2009 fall resulted in his being taken to Coon Memorial Hospital for a CT-Scan of his head and neck, which revealed nothing wrong.

Plaintiff's additional MRI and his January 15, 2010 X-Ray also failed to show anything other than the already-diagnosed Degenerative Joint Disease and mild levoscoliosis.  Plaintiff was referred to a pain specialist and a neurologist on February 25, 2010 by defendant FISK.

Plaintiff alleged that he continued to have frequent falls, but states he was taken to the infirmary, and received responsive and appropriate medical treatment.  The only exception to that pattern may be the April 23, 2010 fall when plaintiff contends he hurt his groin.  A nurse and two officers attempted to lift plaintiff into a wheelchair, but plaintiff says he screamed they were hurting his groin so they put him back down.  It was ten hours before plaintiff was picked up, this time by four people, at which time he was examined by the Director of Nurses TENORIO and Sr. LVN ROWLEY, placed on a gurney, and taken to a segregation cell where he was placed on the floor.  At this point, it appears a determination was made that plaintiff was malingering as it was only three days later that plaintiff was bused to the Clements Unit where, on April 29, 2010, plaintiff was informed by his entire treatment team, consisting of physician,

Dr. LEEAH; P.A.-C/PRN FISK, Director of Nurses TENORIO, Facility Health Administrator

PAGE, and Major WILSON that further medical treatment was terminated and that they did not

believe his complaints of pain and disability.  They informed him they felt he was "running a

scam."

Even if the Court were to accept plaintiff's allegations that he was in significant pain and

assume that the diagnoses and treatment by medical professionals were erroneous in whole or in

part, the Court notes the issue of appropriate medical care is not before it.  Instead, the issue is

whether defendants were deliberately indifferent to plaintiff's serious medical needs.  Negligent

or erroneous medical treatment does not provide a basis for a section 1983 claim. *Graves v.*

*Hampton,* 1 F.3d 315, 319 (5th Cir.1993).  A disagreement over the appropriate medical

treatment constitutes, at most, a possible claim of medical malpractice appropriately addressed

under state law.  *Estelle v. Gamble,* 429 U.S. 97, 107-08, 97 S.Ct. 285, 293, 50 L.Ed.2d 251

(1976); *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir.1991).

Consistent with the standard for deliberate indifference is a recognition that negligent or

mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not

provide the basis for a claim under section 1983.  *See Estelle,* 429 U.S. at 106 ("[m]edical

malpractice does not become a constitutional violation merely because the victim is a prisoner");

*see also Varnardo v. Lynaugh,* 920 F.2d 320, 321 (5th Cir.1991) (unsuccessful medical

treatment, neglect, nor medical malpractice give rise to a § 1983 cause of action) (citations

omitted).

The fact that plaintiff, or his physical therapist, or even another physician might have

reached a different conclusion is not determinative.  Differences of opinion among physicians as

to the appropriate method of treatment do not constitute deliberate indifference. *Campbell v. Martinez,* No. Civ. A. 4:03-CV-299-Y, 2003 WL 22410576, at *3 (N.D.Tex. May 14, 2003), *aff'd,* 96 Fed. App'x 237 (5th Cir.2004); *see also Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

Plaintiff received careful and responsive treatment, including cold packs, heat packs, medication, physical therapy, CT-scans, repeated MRIs and X-Rays, lifting and work restrictions, crutches, and a back brace. If, after reviewing all of plaintiff's medical tests, plaintiff's medical care givers concluded there was no indication of injury commensurate with plaintiff's claims of pain and disability and that plaintiff was, in fact, malingering, that decision did not constitute deliberate indifference.

As long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *See Youngberg v. Romeo,* 457 U.S. 307, 322-23, 102 S.Ct. 2452, 2461-62, 73 L.Ed.2d 28 (1982).

Plaintiff's allegations against his defendant medical caregivers fail to state a claim of deliberate indifference. At best, he possibly presents facts which might support a claim of negligence and has, therefore, failed to state a claim on which relief can be granted.

**REMAINING CLAIMS**

As to plaintiff's complaints about slights or a lack of accommodation from non-medical prison personnel, prison officials have no constitutional duty to believe an inmate's claims about his medical condition as opposed to the findings of medical professionals. *See, e.g., Althouse v.*

*Roe*, 542 F.Supp.2d 543 (E.D.Tex. 2008) (citing *Taylor v. McElvaney*, slip op.no. 1:01cv94

(N.D.Tex., Aug. 12, 2002)(unpublished) (available at 2002 WL 32138256)(no duty to believe

inmate's allegations over officer's statement and medical record) (citations omitted)).  Therefore,

plaintiff's claims against non-medical prison personnel lack an arguable basis in law and are

frivolous.  *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

     Although plaintiff claims some defendants engaged in retaliatory acts against him, he

does not state a claim on which relief can be granted.  To claim retaliation, a prisoner must allege

(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his

or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *McDonald v.

Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  The inmate must be able to point to a specific

constitutional right that has been violated.  *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir.1999).

To state a claim, the inmate must allege more than his personal belief that he is the victim of

retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).  Conclusory allegations of

retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a

chronology of events from which retaliation may plausibly be inferred.  *Woods v. Smith*, 60 F.3d

1161, 1166 (5th Cir. 1995).  A plausible entitlement to relief exists when the allegations in the

complaint cross the threshold separating the "conclusory" from the "factual" and the "factually

neutral" from the "factually suggestive."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127

S.Ct. 1955, 1966 n.5, 167 L.Ed.2d 929 (2007).  Moreover, causation requires the plaintiff show

that but for the retaliatory motive, the adverse act would not have occurred.  *McDonald*, 132

F.3d at 231.  Finally, the retaliatory adverse act must be more than inconsequential or *de*

*minimis*, that is, it must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights.  *Morris v. Powell*, 449 F.3d 682 (5th Cir. 2006).

Plaintiff has failed to identify the constitutionally protected activity which triggered the claimed retaliation or allege facts showing an intent to retaliate and that, but for the retaliatory intent, the adverse act(s) would not have occurred.  Plaintiff has filed to state a claim of retaliation on which relief can be granted.

Plaintiff also claims he was denied Due Process in that Dalhart Unit Grievance Investigator CONNER blocked his emergency life endangerment grievance and told him he had to submit it as a regular grievance, only one of which could be submitted every seven days.  The narrowing of prisoner due process protection announced in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), leaves plaintiff without a federally-protected right to have his grievances investigated and resolved.  Any right of that nature is grounded in state law or regulation and the mere failure of an official to follow state law or regulation, without more, does not violate constitutional minima.  *See, e.g., Murray v. Mississippi Dept. of Corrections*, 911 F.2d 1167, 1168 (5th Cir. 1990); *Ramirez v. Ahn*, 843 F.2d 864, 867 (5th Cir.), *cert. denied*, 489 U.S. 1085, 109 S.Ct. 1545, 103 L.Ed.2d 849 (1989); *Baker v. McCollan*, 433 U.S. 137, 146-47, 99 S.Ct. 2689, 2695-2696, 61 L.Ed.2d 433 (1979).  Plaintiff's claim against defendant CONNOR lacks an arguable basis in law and is frivolous.  *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff also says some grievances which he sent to the Huntsville Unit while he was on the Clements Unit were missing; however, grievances are not sent by an innate to another unit,

but are submitted to the unit grievance department where he is housed.  Plaintiff does not allege any fact to show how any of the named defendants are responsible for missing grievances.

Moreover, plaintiff's complaints which he mailed to defendant PAGE were not properly submitted grievances, and plaintiff has alleged no fact to show that defendant PAGE did or did not receive his complaints or that any of the defendants did anything to them.

Lastly, plaintiff complains he was written two disciplinary cases which he says were false.  There is no longer a freestanding section 1983 claim for malicious prosecution in this Circuit.  *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003).  Thus, an inmate's claim that an officer initiated disciplinary proceedings against him without probable cause does not state a claim.  *Id*.

## CONCLUSION

This is an unusual case in which the record clearly shows that, while medical personnel recognized plaintiff's initial complaints of injuries and provided prompt and responsive treatment, as time progressed, their tests did not reveal any basis for plaintiff's increasing complaints of pain and disability.  Plaintiff's doctor eventually determined plaintiff was malingering.

This Court does not examine whether that determination was correct; only whether plaintiff's serious medical needs were treated with deliberate indifference.  As previously noted, as long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *See Youngberg v. Romeo,* 457 U.S. 307, 322-23, 102 S.Ct. 2452, 2461-62, 73 L.Ed.2d 28 (1982).  Plaintiff's disagreement with the judgment of his medical caregivers does not support a claim for relief under section 1983.  *Varnado v. Collins*,

920 F.2d 320, 321 (5th Cir. 1991). The Court does not substitute its own judgment for that of

medical professionals.

For the reasons set forth above and pursuant to Title 28, United States Code, sections

1915A and 1915(e)(2), as well as Title 42, United States Code, section 1997e(a), it is the

RECOMMENDATION of the Magistrate Judge to the United States District Judge that the Civil

Rights Complaint filed pursuant to Title 42, United States Code, section 1983, by plaintiff JOHN

AMEEN ABDULLAH be DISMISSED WITH PREJUDICE AS FRIVOLOUS AND

WITHOUT PREJUDICE FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN

BE GRANTED.

<u>INSTRUCTIONS FOR SERVICE</u>

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 12th day of April 2013.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**\* <u>NOTICE OF RIGHT TO OBJECT</u> \***

Any party may object to these proposed findings, conclusions and recommendation.  In
the event parties wish to object, they are hereby NOTIFIED that the deadline for filing
objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly
above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or
transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on
or before the fourteenth (14th) day after this recommendation is filed** as indicated by the
"entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).